[No. H013602. Sixth Dist. Apr. 8, 1996.]

IULA ADDY, Plaintiff and Appellant, v.
BLISS & GLENNON et al., Defendants and Respondents.

**COUNSEL**

Gary B. Wesley for Plaintiff and Appellant.

Donfeld, Kelley & Rollman and Paul M. Kelley for Defendants and Respondents.

## OPINION

**COTTLE, P. J.**—Iula Addy appeals the summary judgment entered in favor of her former employer, Bliss & Glennon (B&G), in this employment discrimination action. Her primary contention on appeal is that the trial court applied the incorrect standard in granting summary judgment. She contends that B&G was required to "negate each of the theories of liability contained in the complaint" (capitalization omitted) before it would have been entitled to summary judgment. B&G, in contrast, argues that it "may show a cause of action has no merit [merely] by pointing out to the court the absence of essential evidence to support some element of plaintiff's case." Although we agree with Addy that a moving defendant may not shift the burden to the plaintiff to put on a prima facie case simply by pointing out to the court the absence of essential evidence to support plaintiff's case, and that a defendant must make an affirmative showing in support of his or her motion, we conclude that B&G has made a sufficient showing here to entitle it to summary judgment. Accordingly, we shall affirm the judgment.

### FACTS

Addy, an Asian, received an A.A. degree in computer-aided office management from Condie Junior College in 1985. From 1986 to 1988, she worked for Weber Insurance Service assisting employees in operating computer terminals. From 1988 until 1990 she worked at Wallis and Wallis insurance agency.

On July 17, 1990, Addy was hired as an "underwriting assistant" by B&G, a corporation engaged in underwriting wholesale insurance, and was assigned to its Morgan Hill branch office. She received a salary of $2,000 per month, plus overtime. Her primary job responsibility was to issue policies.

In late 1990, Addy received a generally favorable performance review, and her salary was increased to $2,050 per month plus overtime. She did not receive a performance review during 1991, as the company did not issue any that year. In February 1992, Addy went on maternity leave, returning in May. Upon her return, Addy's supervisor, Carol Marquez, permitted Addy to begin and end work early to accommodate a child-care scheduling problem.

In June 1992, B&G advertised for a management trainee position. The salary for the management trainee position was $250 per month less than what Addy was earning at the time. Both Addy's position ("underwriting assistant") and the advertised position ("management trainee") offered the identical promotional opportunity—to "underwriter."

B&G's newspaper advertisements for the position read: "MANAGEMENT TRAINEE. College grad to learn surplus insurance field. Some office exper. helpful, but not nec. Office in Morgan Hill w/some training in L.A. req'd. Send resume to . . . ." As a result of this job search, B&G hired a college graduate named Jose Ochoa.

Addy mailed an application for the management trainee position to B&G's main branch on June 15, 1992. However, by the time the application was received, B&G had already hired Mr. Ochoa.

Just a few days before Addy mailed in her application for the management trainee position, the president of B&G, Robert Abramson, had called a telephonic meeting with the Morgan Hill supervisor, Carol Marquez, and the two underwriting assistants, Addy and Penny Robinson, to address tardiness in issuing policies and persistent mistakes in the policies once issued. Abramson stated that these problems, which had come to light because of customer complaints, had to be corrected immediately and that policies needed to be issued correctly in the first place. Some of the problems involved Addy's work before she went on maternity leave.

On June 17, 1992, Addy called Abramson to ask whether he had received her resume for the management trainee position. He told her that the position was not a promotion for her, as it paid less than she was receiving, and that B&G had already hired Jose Ochoa, who met the job qualifications which included a four-year college degree.

The next day, Addy called in sick and went to the Equal Employment Opportunity Commission (EEOC) to file a charge of race and sex discrimination based on not having been selected for the position of management trainee.

When Jose Ochoa was hired, some of the work of the two underwriting assistants was transferred to him. According to Addy, this was very demoralizing. She made errors in issuing policies which were documented in the regular course of business in memoranda dated July 14, 1992, July 16, 1992, July 17, 1992, July 27, 1992, and February 11, 1993. Even after additional training, Addy did not appear to her supervisor to grasp the essentials of proper policy issuance. In addition, she repeatedly failed to issue policies within 30 days of a request for coverage, renewal or amendment, as is B&G's policy. Finally, numerous customers complained to B&G about Addy's telephone manner and her failure to follow up on calls and to issue policies.

In July 1992, Penny Robinson, the other underwriting assistant, and Jose Ochoa, the newly hired management trainee, asked if they too could work

flextime like Addy. In response to their request, and to assure late afternoon coverage, Carol Marquez issued a memorandum on July 24, 1992, stating: "Due to the fact that we cannot discriminate by allowing some people to have flex time and some not, there will be no flex time permitted in the Morgan Hill office."

The following day, Addy failed to appear at a training session scheduled to address various policy issuance matters.

Based on the loss of her flextime, Addy filed a second charge with the EEOC. In the charge, she alleged B&G transferred some of her work to Ochoa and eliminated her flextime schedule "in retaliation for having filed my prior charge with EEOC."

On October 15, 1992, Addy received a "less than satisfactory" performance review and was put on three months' probation. In January 1993, Marquez discovered several policies on Addy's desk that had been pending for 30 days or more. In addition, Marquez received at least four complaints from customers regarding Addy's failure to issue policies or errors made in issued policies. At that point, Marquez and the other underwriting assistant issued all the overdue policies. Addy's work output at that time was half that of another employee performing the same job function.

On February 2, 1993, a B&G vice-president met with Addy and explained that the company could no longer tolerate Addy's "sub-par" performance. She was given three options: termination, demotion with pay cut, or resignation with severance pay to be determined by the board of directors. Addy asked for time to consider the options. The next day the vice-president informed Addy that the board had authorized $4,000 in severance pay. He stated the offer remained open through February 5 and that Addy could take the next three days off with pay to consider her decision. He also stated that if she returned to work on Monday February 8, 1993, she would be deemed to have accepted the demotion option.

On February 4, 1993, Addy filed a third charge with the EEOC, complaining she had been denied training and was being discriminated against because of filing her previous two charges.

On February 8, 1993, Addy reported for work and her job title became "Senior Clerk" with a salary of $17,200 per year. She worked through February 12, but did not report to work after that.

On May 27, 1993, Addy filed a fourth charge with the EEOC, alleging demotion and constructive discharge in retaliation for filing earlier charges.

## STANDARD OF REVIEW

A summary judgment may be granted where it is shown that the "action has no merit or that there is no defense" thereto. (Code Civ. Proc., § 437c, subd. (a).) To make this showing, the moving party must set forth admissible evidence establishing "that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

In 1992, the Legislature amended Code of Civil Procedure section 437c to define what a moving party must prove in order to show that the responding party's cause of action has no merit: "A cause of action has no merit if one or more of the elements of the cause of action, even if not separately pleaded, cannot be established, or if there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, [former] subd. (f), Stats. 1992, ch. 1348, § 1.) In addition, the Legislature set forth for the first time the moving party's substantive burden on a motion for summary judgment. Where the moving party is a defendant, that party "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, [former] subd. (n)(2), Stats. 1992, ch 1348, § 1.)

In 1993, the Legislature added the following language at the end of Code of Civil Procedure section 437c, subdivision (n)(2), which was redesignated subdivision (o)(2): ". . . or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Stats. 1993, ch. 276.) In addition, the Legislature redesignated the quoted portion of subdivision (f) as subdivision (n), with minor modifications.

As we noted in *Hagen* v. *Hickenbottom* (1995) 41 Cal.App.4th 168, 183-184 [48 Cal.Rptr.2d 197], "[t]here was initial debate as to whether the new statutory requirement of a showing that an element 'cannot be established' effected any significant change from the preexisting requirement that the defendant 'conclusively negate' the element. [Citations.] There is evidence that the 1992 and 1993 amendments were in some respects influenced by the decision of the United States Supreme Court in *Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548], and those

who support the view that the amendments have substantially lessened a moving defendant's burden sometimes point to *Celotex*'s statement that, under the federal summary judgment rule, where at trial the nonmoving party would have the burden of proving the element in issue 'the burden on the moving party may be discharged by "showing"—*that is, pointing out to the district court*—that there is an absence of evidence to support the nonmoving party's case.' [Citations.]"

We went on to say, however, that we disagreed "with those [such as the court in *Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1287-1289 (44 Cal.Rptr.2d 335)] who may be understood to suggest that a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case. It is clear to us, from the requirement of the 1992 amendment that a defendant have 'shown that one or more elements of the cause of action . . . cannot be established' (Code Civ. Proc., § 437c, former subd. (n)(2), Stats. 1992, ch. 1348, § 1), that a defendant must make an affirmative *showing* in support of his or her motion. Such a showing connotes something significantly more than simply 'pointing out to the . . . court' that 'there is an absence of evidence': before the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiff's case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case. But where such a showing can be made we consider it both fair to the defendant and consistent with efficient administration of justice that the plaintiff be called upon, on risk of summary judgment, to make a prima facie case." (*Hagen* v. *Hickenbottom, supra*, 41 Cal.App.4th at p. 186.)

Although *Hagen* v. *Hickenbottom, supra*, dealt only with the 1992 amendments to the summary judgment statute, and not with the 1993 amendments, we believe the reasoning is equally sound with respect to the latter amendments. ■ Code of Civil Procedure section 437c, subdivision (o)(2) reiterates the requirement originally found in former subdivision (n)(2) that a moving defendant show, by admissible evidence, "that one or more elements of the cause of action . . . cannot be established . . . ." Thus, the same rule—that a moving defendant must make an affirmative showing in support of his or her motion—should apply.

■ Since summary judgment involves pure matters of law, we review a summary judgment ruling de novo to determine whether the moving and opposing papers show a triable issue of material fact. (*Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1156 [203 Cal.Rptr. 419]; *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

## Burden of Proof in Employment Discrimination Actions

■ Because Addy's employment discrimination lawsuit is analogous to a federal Civil Rights Act title VII claim (42 U.S.C. § 2000e), it is evaluated under federal law interpreting title VII cases. (*Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316 [237 Cal.Rptr. 884].) In *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817], the United States Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' [Citation.] Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 252-253 [67 L.Ed.2d 207, 215, 101 S.Ct. 1089], fn. omitted; see also *Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181] [to avoid summary judgment, plaintiff must produce " 'substantial, responsive evidence' that the employer's showing was untrue or pretextual"].)

## Discussion

The pleadings define the issues to which a summary judgment motion must be directed. (*Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 5].) Accordingly, we begin our analysis by examining the pleadings. Addy's four-page first amended complaint simply alleges "unlawful employment discrimination." (Capitalization omitted.) Nonetheless, we discern three potential causes of action: (1) discriminatory failure to promote to the management trainee position, (2) retaliatory reassignment of work and elimination of flextime, and (3) retaliatory denial of training, demotion, and constructive discharge. We shall address each of these causes of action separately.

### A. *Failure to Promote*

■ "During a trial, once a plaintiff in a case involving an unlawful refusal to promote establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut that prima facie showing 'by producing evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason.' (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. at p. 254 [67 L.Ed.2d at p. 216].) The responsibility of the defendant is to 'clearly set forth, through the introduction of admissible evidence, the

reason for the plaintiff's rejection.' (*Id.* at p. 255 [67 L.Ed.2d at p. 216], fn. omitted.) The explanation of reasons for the refusal to promote 'must be clear and reasonably specific.' (*Id.* at p. 258 [67 L.Ed.2d at p. 218].)" (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1035-1036 [272 Cal.Rptr. 264].)

"Although the burden of proof in a title VII action claiming an unjustifiable refusal to promote ultimately rests with the plaintiff (450 U.S. at p. 253 [67 L.Ed.2d at p. 215]), in the case of a motion for summary judgment or summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. (*Barnes v. Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444].) In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. [Citations.]" (*University of Southern California v. Superior Court, supra*, 222 Cal.App.3d at p. 1036.)

■ In the instant case, B&G submitted admissible evidence demonstrating that Addy could not establish a prima facie case of failure to promote based on discrimination.[1] It showed, first, that the position was not a promotion for Addy. The management trainee position had the same advancement potential as the job she currently occupied, and it paid less than she was earning as an underwriting assistant. In addition, for Addy to make a prima facie showing that she might have been hired for the position had it not been for unlawful discrimination, she would have had to show she was qualified for the position and that the position was still open when she applied for it. Yet B&G submitted evidence in the form of the declaration of its president, Robert Abramson, (1) that it sought a person with a four-year college degree for the management trainee position and that Addy did not have such a degree, and (2) that Jose Ochoa had already been selected for the position when Addy's application was received.

In addition to showing that Addy could not make a prima facie case of discriminatory failure to promote, B&G also presented evidence that it had legitimate, nondiscriminatory reasons for not offering Addy the position: it sought a person with a four-year degree, it had already hired Jose Ochoa when Addy's application was received, and the position was not a promotion. Addy, in turn produced no evidence demonstrating that B&G's showing was untrue or pretextual. Under these circumstances, we conclude that summary judgment on Addy's failure to promote cause of action was properly granted.

---

[1] We note that B&G did not merely "point to" Addy's lack of evidence to support her claim but rather submitted evidence itself demonstrating that Addy could not support her claim. (See discussion of the distinction in "Standard of Review," *ante.*)

## B. *Reassignment of Work and Elimination of Flextime*

■ Addy alleges some of her work was reassigned to the new management trainee, Jose Ochoa, and her flextime was eliminated in retaliation for her having filed a charge of discrimination with the EEOC.

"To establish a prima facie case of retaliation, a plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. [Citation.]" (*Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 614 [262 Cal.Rptr. 842].)

In the instant case, Addy can show she engaged in protected activity (filing a charge of discrimination with the EEOC) and that she was thereafter subjected to adverse employment action (some of her work was transferred, and her flextime was eliminated). However, in order to establish a prima facie case of retaliation, she must also show a *causal link* between the adverse employment actions and the filing of her charge of discrimination with the EEOC. Addy has not made that showing here; nor has she rebutted B&G's evidence that there was no causal link between the adverse employment actions and the filing of the EEOC charge. B&G presented evidence it had legitimate, nondiscriminatory business reasons for reassigning some of Addy's work and eliminating her flextime. In her declaration, Addy's supervisor, Carol Marquez, stated that after Ochoa was hired, some of the work of both underwriting assistants in the Morgan Hill office was transferred to him. As Addy was treated exactly the same as her coworker, Penny Robinson, she cannot establish a prima facie case of discrimination based on having filed the charge of discrimination with the EEOC. (Cf. *Acosta* v. *University of District of Columbia* (D.D.C. 1981) 528 F.Supp. 1215, 1224.)

With respect to the elimination of flextime, Marquez stated that both Robinson and Ochoa had asked if they too could have flextime. She explained that B&G needed office coverage in the late afternoon. To maintain parity among the employees, flextime was eliminated. When one pierces this claim, one sees that Addy's complaint is that she was treated the same as other employees rather than being given preferential treatment. Addy has failed to demonstrate the existence of a triable material controversy as to whether B&G's stated reasons for eliminating flextime were either untrue or a pretext for discrimination. Under these circumstances, Addy's second cause of action cannot stand.

## C. *Denial of Training, Demotion and Constructive Discharge*

■ Addy alleges she was denied training, demoted, and later constructively discharged as a result of filing various charges of discrimination with

the EEOC. To rebut these charges, B&G submitted evidence that Addy received the same training as the other underwriting assistant in the office, Penny Robinson, with the exception of a single training session on July 25, 1994, at which Addy failed to appear. In her deposition, Addy stated that she failed to attend that training session because she woke up with a headache. Otherwise, her training was the same as Penny Robinson's.

With respect to the demotion, B&G submitted substantial evidence that Addy was not performing the job of underwriting assistant in a satisfactory manner. Marquez chronicled customer complaints, persistent mistakes in issuing policies, tardiness in issuing policies, unacceptably low work output, unsatisfactory telephone manner, and failure to accept responsibility for mistakes. In response to this evidence, Addy merely points out that it was not Marquez who decided to demote her (presumably Marquez had sufficient grounds to do so) but rather it was Robert Abramson who made the decision from the B&G head office in the Los Angeles area. However, in Addy's complaint she alleges that "defendant CAROL MARQUEZ participated in each of the adverse employment determinations . . . ." " " 'A judicial admission in a pleading . . . is not merely evidence of a fact; it is a conclusive concession of the truth of a matter which has the effect of removing it from the issues. . . .' " (*Walker* v. *Dorn* (1966) 240 Cal.App.2d 118, 120 [49 Cal.Rptr. 362].) In summary, Addy has not presented any evidence that her demotion was for reasons other than a failure to satisfactorily perform in her position.

Finally, Addy alleges that she was constructively discharged as a result of not receiving training and her demotion. ■ To prevail on a claim for constructive discharge, "an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

Moreover, the Supreme Court explained, "[A]n employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. [¶] ' "An employee may not be unreasonably sensitive to his [or her]

working environment . . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress." ' [Citation.] [¶] In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. [Fn. omitted.] In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. [Citation.] Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Turner* v. *Anheuser Busch, Inc., supra*, 7 Cal.4th at pp. 1246-1247.)

 In the instant case, Addy predicates her constructive discharge claim on an alleged denial of training and on her demotion. However, as noted above, B&G submitted evidence that Addy received the same training as the other underwriting assistant, except for one training session which she missed, and her demotion was due to her inability to successfully satisfy the job requirements for the underwriting assistant position. Demotions, even with reductions in pay, are not by themselves enough to constitute constructive discharge. (*Turner* v. *Anheuser Busch, Inc., supra*, 7 Cal.4th at p. 1247.) Addy has failed to present evidence demonstrating the existence of a triable material controversy as to whether B&G's stated reasons for its actions were either untrue or a pretext for discrimination. It was incumbent upon Addy to present some evidence creating a material factual issue, and she did not do so. Accordingly, the summary judgment was properly granted.

### DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Mihara, J., concurred.

A petition for a rehearing was denied May 2, 1996.